**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDWARD MESA,<br><br>                    Plaintiff,<br><br>v.<br><br>HUDSON COUNTY BOARD OF CHOSEN FREEHOLDERS, JEFFREY DUBLIN, Chairman, HUDSON COUNTY SHERIFF'S DEPARTMENT, CHIEF BARTUCCI, SHERIFF LUZZI<br><br>                    Defendants. | Civ. Action No. 09-3576 (KSH)<br><br><br>**OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

Plaintiff Edward Mesa ("plaintiff" or "Mesa") brings his complaint alleging that Hudson County officials and governmental entities violated his First Amendment rights when he was removed from a meeting of the Hudson County Board of Chosen Freeholders ("Freeholders" or "Board") on April 24, 2008. Board Chairman Jeffrey Dublin had ordered him removed after Mesa insisted on speaking on a topic not under discussion and then refused to sit down. Mesa also complains that two officers with the Hudson County Sheriff's Department ("Sheriff's Department") violated his First and Fourth amendment rights by removing him from the meeting and allegedly using excessive force to restrain him from re-entering.

1

All five defendants—the Hudson County Board of Chosen Freeholders, Freeholders Chairman Jeffery Dublin, the Hudson County Sheriff's Department, and Sheriff's Officer Chief John Bartucci ("Bartucci") and Sheriff's Detective John Luzzi[1]—now move for summary judgment, arguing that Mesa's removal did not offend the First Amendment because he repeatedly disrupted the April 24 Freeholders' meeting ("the meeting") and further that the officers acted reasonably to prevent further disturbance by him.   For the reasons explained below, defendants' motions for summary judgment (D.E. 59, 60, 61 and 66) are granted.

**Background**:

Edward Mesa is a retired Hudson County Sherriff's Officer and active participant in Hudson County politics.   He had attended between 10 and 20 meetings of the Hudson County Freeholders prior to the April 24, 2008 meeting. (Def. Hudson Cty. Sheriff's Department Statement of Material Facts ("SUMF"), D.E. 61, attach. 4 at ¶¶ 2–4.)  Mesa, who had also attended meetings of the Union City Council during the 1970s and 1980s, often spoke on economic issues and "the way the county wastes money."  (Id. at ¶¶ 1–4; Dep. of Edward Mesa, ("Mesa Tr.") at 266:5–6.)  Mesa acknowledges that he is familiar with the structure and procedures of Freeholders' meetings, including their division into two different periods for public comment, one of which is limited to discussing agenda items, and the other which is open to general comments.  (SUMF at ¶¶  2–4.)  Citizens can sign up to speak during either period.  (Id.)

---

[1] The complaint incorrectly pleads Dublin and Luzzi as "Dubling" and "Lizza."

Prior to the April 24 meeting, Mesa had spoken exclusively during the general comment period; that night marked the first time he signed up to address an agenda item. (SUMF ¶ 5–7; Mesa Tr. 265:20–21.)  The meeting, chaired by Dublin, began with a presentation on the budget by the Hudson County Executive,[2] although neither the budget nor the County Executive's presentation was on the board's agenda that night. (Id. at ¶ 6.)  Mesa testified that there were no copies of the agenda available when he arrived at the meeting, but he signed up to speak on an agenda item anyway because "I knew what I was going to address."  (Id. ¶ 7; Mesa Tr. 302:22.)  Mesa also testified that, despite his previous experiences speaking at numerous Freeholders' meetings, he was "confused" that night, explaining that "[if] I was there [speaking] at the wrong time, so be it, but I thought I was there at the right time." (Mesa Tr. 307:2–4 and 309:22.)  After the County Executive finished talking and had left the room, a clerk announced that the public could address the Board "on the agenda only."  (Tr. of Freeholders Meeting, April 24, 2008 ("Tr."), at 38.)

When his name was called, Mesa went to the podium, and began, "(t)he County Executive took off like a bat out of hell.  I guess he don't want to hear anything."  (Id. at 39:4–6.)  Mesa continued, "[h]is job should be here.  He is talking about hard times in Hudson County and he is talking about growth. "  At that point Dublin cut in:

Excuse me.  Is this on the agenda?  Can you tell me what item?

---

[2] Six other Freeholders were present that night: Doreen DiDomenico; Maurice Fitzgibbons; Thomas Liggio; Jose C. Munoz; Bill O'Dea; and Eliu Rivera.  (Apr. 24 Tr. at 1.)  Also present of behalf of the Freeholders were Edward Florio, board counsel, as well as the board clerk and administrator. (Id.)

> Mesa:  I am not going to tell you an item because I don't take notes, sir.
> Dublin:  Then you have to sit down.
> Mesa:  I am not going to sit down.  I want to speak.
> Dublin:  No.
> Mesa:  I am here to speak.
> Dublin:  I am in charge of this meeting, alright?
> Mesa:  I know, but I am your boss.
> Dublin:  You are not my boss. (Tr. at 39:11 to 40:3.)

The transcript indicates that Dublin addressed several officers in the room, saying,

"Sheriff, please."  (Id. at 40:4.)  Mesa, however, did not sit down, and continued:

> You are going to get a suit, I am telling you.  You are going to have to
>       arrest me.  Arrest me.
> Dublin: Then I am asking you to speak on the agenda item and tell me which
>       item number.
> Mesa: I am talking on the agenda.
> Dublin: What number?
> Mesa: I don't have it.
> Dublin: Than you cannot speak.
> Mesa: I am talking about the increments on the taxes.  It is not on there.
>       There  is going to be an increment –
> Dublin: It is not on the agenda.  Give me an agenda item or you will sit down.
>       The budget is not on the agenda.  (Id. at 40:9–41:5.)

At some point, Mesa began walking back to his seat,[3] but he continued arguing with

Dublin:

> You know something? You really amaze me.
> Dublin: Thank you.
> Mesa: You are a wonderful person.
> Dublin: Thank you.
> Mesa: You just want me to sit down and I am going to wait for the other one,
>       however, I think if I was in Africa you will be the guy that would put me
>       in the boat to America. (Id. at 41:7–17.)

Dublin, in response to this last comment, told the officers, "I want him out of

here.  I want him out."  (Id. at 41:18–19.)  Another board member, Freeholder O'Dea,

---

[3] Mesa himself apparently has difficulty recalling the precise sequence of events.  *Compare* Mesa Dep. 33:12 *with* Mesa Dep. 177:1–9.

interjected, "[i]t is free speech." (Id. 41:22.) Mesa refused to leave, saying, "[y]ou have to arrest me." (*Id*. 41:24–25.) According to the transcript, an officer then asked Mesa to "step outside," and Mesa replied, "[a]re you arresting me? Are you are arresting me?"

Mesa claims that he already was seated when he was approached by three officers: John Bartucci, whom Mesa describes as a friend; Detective John Luzzi, who did not know Mesa and was in plainclothes; and a third officer who is not named in the amended complaint. (Mesa Tr. at 206:22 and 251:25.) Mesa testified that Bartucci and Luzzi "grabbed me" and "had their hands on me," but he acknowledges that the officers neither dragged nor pushed him. (Mesa Tr. at 234:2–12; SUMF ¶ 14.) Mesa testified that he told the officers, "I am going to sue you," but this comment does not appear in the meeting's transcript. (Id. at 231:16; SUMF ¶ 15.) According to Mesa, he and the officers walked about 25 feet into another room where, he claims, Luzzi lifted Mesa's right arm behind his back. Defendants dispute this contention, as well as Mesa's allegation that Bartucci ordered Luzzi to "[h]old him tight, hold him tight" and "press him." (Mesa Tr. at 242:18–19.) According to Mesa, Luzzi "[was] pushing up, upward, where my arm can no longer go any further" and held him in that position for two minutes before letting him go. (Id. at 258:19–20.) Mesa also claims that Luzzi screamed at him, but he could not recall what Luzzi said because "at this point I am on flashback . . . I am not connecting." (Id. at 243:2–3.)

Mesa's complains that the incident "trigger[ed] a post-traumatic stress syndrome relating to a similar violent incident" in 1986 involving an alleged assault

5

against him by Union City police.  (Compl. ¶ 14.)  Mesa testified that, while he felt

pain in his arm, he did not suffer bruising or any other physical injury, and did not

seek treatment by a physician for the pain he had suffered.  (Id. at 262:16–263:4.)

Instead, Mesa claims he suffered "mind bruises" and felt "disoriented" because of the

flashbacks and "needed help."  (Mesa Tr. 287:10–13.)   He drove that night to see a

psychiatrist. (Mesa Tr. 290:17–13 and 291:18–292:10.)  Months later, in November

2009, Mesa traveled to Ecuador to cure himself with a treatment involving the

injection of "mother cells," which he described as cells taken "from your chest. . . [to]

replace the ill cells and the dead cells."  (Id. at 330:1–331:21.)

     After the incident, Mesa filed a complaint with the Internal Affairs Unit of the

Sheriff's Department.  (Mesa Dep. at 328:24–329:1.)  The investigation determined

that Mesa's complaint was "unfounded."  (SUMF ¶ 17.)  In July 2009, Mesa filed his

federal lawsuit.  The amended complaint (D.E. 15) asserts violations of the First,

Fourth and Fourteenth amendments.  He alleges that Dublin and the Board of

Freeholders "deliberately and willfully infringed upon Plaintiff's constitutional

rights to free speech, association and to petition the government for relief afforded

to him under the First Amendment."[4]  (Compl. ¶ 16 and 19.)  He also accuses the

Sheriff's Department, Bartucci and Luzzi of violating his right to free from

unreasonable search and seizure and excessive use of force, and of violating his

right to exercise free speech.  (Id. ¶ 25.)

---

[4] Count one also seeks punitive damages based on "Mayor Turner's willful and malicious conduct." Because "Mayor Turner" is not a named defendant and is not mentioned elsewhere in the complaint, the Court assumes this reference was made in error.  (Compl. ¶ 19.)

In a deposition, Dublin testified that he is responsible for maintaining order at Freeholders' meetings and that Mesa had refused to cooperate with his instructions and was disturbing the meeting. Mesa was "out of order. He was yelling into a [microphone] and we're trying to run a public meeting." (Dublin Tr. 54:21–23; 58:12–19.) Dublin stated that he was asking Mesa for an agenda item "so we could both stay on point [with] what was going on in the meeting . . . Not only is it helpful to me, but it is also helpful to the rest of the colleagues because a lot times there's questions [on] an agenda item." (Id. 43:16–44:4.) Dublin said that he finally told the officers to remove Mesa because their exchange had become "personal" when Mesa made an allegedly racist comment. (Tr.68:23–25.) Dublin, who is African-American, testified that, "a racist comment shouldn't be in a public forum." (Id. 66:22–23.) He explained that:

> A comment like that shouldn't have [ever] been said. Because not only it hurt me, but there [were] other African-Americans sitting in that audience also . . . If he wanted to talk politics, that was the right setting. To talk about Africa and to talk about being on a ship and going from this place to that place, I don't that was the forum for that." (Dublin Tr. 67:13–23 and 69:1–5.)

The meeting transcript shows that, soon after Mesa's ejection, Dublin told those assembled: Mesa "understands the rules, he has been to several meetings. . . . He couldn't give me a specific agenda item so he didn't – I asked him several times. We are not going to allow people from the public telling us how to run the meetings." (Tr. at 48:9–17.) Some of the Freeholders spoke up, including Freeholder O'Dea, who said that the "the implication was he was removed because of that statement he made." (Id. at 48:24–49:4.)

7

Mesa testified that he did not think that his comment was racist and that if Dublin had taken offense, then "that is his problem."  (Mesa Tr. at 322:10–13.) Mesa, who is of Cuban ancestry, explained that his comment was intended to communicate that Dublin was "selling [his] own people . . . that he was selling me and doing to me what those people were doing to those people that were brought here to America" and was trying to "censor me."  (Mesa Tr. 178:7–15 and 184:1–2.) Mesa admitted that Dublin repeatedly asked him to sit down and advised him that, during that portion of the meeting, members of the public could speak on agenda items only, and that Mesa understood what Dublin meant. (Mesa Tr. 171:15–172:5.) Nonetheless, Mesa explained that he refused to sit down when asked because "I wanted to speak. That is what I went there for," and "I was not finished."  (Mesa Tr. 174:9–12 and 326:3–13.)

As indicated, all defendants filed motions for summary judgment. [5]  The individual defendants assert that they are entitled to qualified immunity, and both the Freeholders Board, which filed jointly with Dublin, and the Hudson County Sheriff's Department argue that they are immune from suit under *Monell v. Department of Soc. Services*, 436 U.S. 658 (1978).  This Court has jurisdiction because Mesa 's alleges constitutional violations brought pursuant Title 42 U.S.C. § 1983.

**Legal Standard:**

---

[5] Plaintiff argues that several defendants' motions for summary judgment should be summarily denied for failure to provide separate statement of undisputed material facts.  (D.E. 71 at 5.)  After reviewing the relevant filings, the Court is satisfied that all defendants have either furnished individual Rule 56.1(a) statements of material facts or else have expressly adopted the statements of other defendants and therefore no defendant has violated the rule.

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must draw "all reasonable inferences from the underlying facts in the light most favorable for the non-moving party." *Battaglia v. McKendry*, 233 F.3d 720, 722 (3d Cir. 2000). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Fakete v. Aetna*, Inc., 308 F.3d 335, 337 (3d Cir. 2002) (citations omitted).

**Discussion:**

**i. Dublin**

A public official who excludes a citizen from a public meeting "must conform [his] conduct to the requirements of the First Amendment." *Montiero v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006). However, the standards applied to determine "whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (citing *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983)).

In a public forum, which includes "public streets, parks, and other public areas traditionally devoted to assembly and debate," *Galena v. Leone*, 638 F.3d 186,

198 (3d Cir. 2011), the State's "restrictions on speech are subject to [strict scrutiny]." *Id.* The State may "impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal citations omitted). However, viewpoint-based restrictions violate the First Amendment "regardless of whether they also serve some valid time, manner [or] interest." *Montiero*, 436 F.3d at 404. (citing *Good News Club,* 533 U.S. at 106).

Restrictions on speech in a "limited public forum" are subject to less stringent scrutiny. *Good News Club*, 533 U.S. at 106 (2001). A State is "not required to and does not allow persons to engage in every type of speech" in a limited public forum, and it may be justified in "'in reserving [the forum] for certain groups or for the discussion of certain topics.'" *Id.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Under the Supreme Court's "refined test" for reviewing restrictions on speech in limited public forums, "content-based restraints are permitted, so long as they are designed to confine the 'forum to the limited and legitimate purposes for which it was created.'" *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 280 (3d Cir. 2004) (quoting *Rosenberger*, 515 U.S. at 829). A "governmental entity creates a limited public forum when it provides for a forum that is limited to use by certain groups or *dedicated solely to the discussion of certain subjects.*" *Galena*, 638 F.3d at 198 (emphasis added) (internal quotation marks and citation omitted). In the case of a municipal or other local government meeting, the matters discussed "may be limited to issues germane to town government," and a

10

meeting chairman can "confine the discussion to the purpose of the meeting" even if the restrictions on speech are not content-neutral.  *Eichenlaub*, 385 F.3d 280–81. However, restrictions on speech in a limited public forum "must be viewpoint neutral and must be 'reasonable in light of the purpose served by the forum.'"  *Id.* at 280 (quoting *Good News Club*, 533 U.S. at 106-07).

In either type of forum—whether a public or limited public forum—a governmental body "may confine [meetings] to specified subject matter" and remove a speaker who is disruptive or who otherwise fails to address the topic at issue in order to maintain "orderly progression."  *Jones v. Heyman*, 888 F.2d 1328, 1329 (11th Cir. 1989) (reversing the district court's decision finding a First Amendment violation where a mayor ordered a speaker removed from a city meeting for, among other things, not addressing the topic under discussion, questioning the mayor's "authority to run the session" and telling the mayor that he was not "big enough" to expel him from the meeting).  Restricting "repetitive" and "truculent" behavior "is the sort of time, place, and manner regulation that passes muster under the most stringent scrutiny for a public forum," and an officer chairing a public meeting need not allow "a speaker to try to hijack the proceedings." *Eichenlaub,* 385 F.3d at 281; *see also Olasz v. Welsh*, 301 Fed. App'x 142, 145 (3d Cir. 2008) (upholding summary judgment where the district court found that a city council president did not violate the First Amendment in repeatedly silencing a fellow councilmember and declaring him "out of order" because the councilmember was engaging in "badgering, constant interruptions, and disregard for the rules of decorum.").

Here, Mesa acknowledges that he signed up to speak on an agenda item at the April 24 meeting; he understood the difference between the meeting's two comment periods; the meeting was confined to the discussion of agenda items when he rose to speak; and he understood what Dublin meant when Dublin told him that the budget was not on the agenda that night and that he needed to identify an agenda item in order to speak at that moment.  Although Mesa claims that he was confused as to what whether the County Executive's presentation was on the agenda and that there were no copies of the agenda available, he also acknowledges that he did not request a copy from the Board's clerk and that, regardless, he was determined to speak during the agenda period.  As he stated, "I knew what I was going to address." By his own admission, Mesa was well versed in the procedures and protocols of Freeholders' meetings and he acknowledges knowing that he could have spoken later, but he was unwilling to wait. Mesa's assertion that he made a "reasonable mistake" (D.E. 69 at 22) is belied by his repeated refusal to stop speaking after being informed by Dublin that the budget was not on the agenda and warned that he had to identify an agenda item or else sit down.  As he told Dublin, "I want to speak. . . I came here to speak."

Mesa argues that he was not disruptive, but the record establishes otherwise. His assertions that he was silenced and "bullied" are belied by his own provocative words reflected in the transcript of the meeting.  Mesa stood up and accused the County Executive of exiting "like a bat out of hell," a comment that set the tone for his subsequent combative remarks.  In response to Dublin, Mesa stated:  "I am not going to tell you an item"; "I am not going to sit down.  I want to speak"; "I am your

12

boss"; and "You are going to get a suit, I am telling you. You are going to have to arrest me. Arrest me." These repeated outbursts are the kind of "truculent" and "disruptive" behaviors that justify removing a citizen from a public meeting to maintain order and decorum, *Jones v. Heyman*, 888 F.2d at 1329, and to prevent a speaker from "hijacking" a meeting. *Eichenlaub*, 385 F.3d at 280–81. Dublin showed patience in repeatedly asking Mesa to speak on an agenda item and heed the meeting's rules; Dublin reasonably could have ordered Mesa to be removed at this point, before Mesa ever made the "Africa" comment.

In this sense, Mesa's final comment cannot be read apart from the exchange that preceded it. The comment indisputably had no relevance to the county business under discussion and marked yet another interruption, this one with racial overtones. Mesa makes much of Dublin's testimony that he asked to have Mesa removed because he found Mesa's Africa remark racist and he claims that Dublin's response suggests "nothing more than a pretext to chill unfavorable speech for his own political self-interest." (D.E. 71 at 2.) In essence, Mesa seeks to convert his own obstreperous behavior into a First Amendment violation by Dublin, despite the evidence that he was the person making a racially-tinged insult.

Moreover, Mesa's racial argument is a red-herring: his words, whether pejorative or not, marked yet another interruption in a series of interruptions demonstrating his refusal to abide by the meeting's established rules—rules that Mesa himself knew, understood and was repeatedly warned about. Whatever was in Dublin's mind at the moment of Mesa's ejection, the record before the Court makes clear that Dublin was following through on his previous warnings in order to

keep the discussion focused on the agenda issues before the Board.  As Dublin consistently testified, the agenda comment period was not the "right forum" for Mesa's remarks. [6]

Dublin's actions were reasonable in light of the circumstances and cannot be said to offend the Constitution.  In analyzing the nature of the forum at issue, Mesa simply states—without further discussion—that when he spoke during the meeting's agenda comment period, he was speaking in a traditional public forum. However, the Court finds that, under relevant precedent, the portion of the Freeholders' meeting in question—and arguably the whole meeting—was a limited public forum because the discussion was restricted to the specific government business on the meeting's agenda.  *See Eichenlaub*, 385 F.3d at 281 (finding that the "citizen's forum portion" of a city meeting was a limited public forum because, although open to all citizens, "even the public discussion section. . . was designed to be limited to matters pertaining to town government" and was not "the equivalent of a municipal theater. . . a public park or street"); *Galena*, 638 F.3d at 198–99 (explaining that a meeting of the Erie County Council "was a limited public forum inasmuch as the meeting was held for the limited purpose of governing Erie County and discussing topics related to that governance" and in such a forum "to avoid infringing on First Amendment rights, the governmental regulation of speech only need be viewpoint-neutral and 'reasonable in light of the purpose served by the forum'") (quoting *Good News Club*, 533 U.S. at 107)).

---

[6] To this end, Dublin stated in his deposition that, had Mesa made the same remark during the *general* public comment period, he did "not know" if at that time he would have asked the officers to escort Mesa out.  (Dublin Dep. at 79:18–80:2.)

Accordingly, in a limited public forum, such as during comment on agenda items at the Freeholders' meeting, "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes for which it was created." *Eichenlaub*, 385 F.3d at 280 (internal quotation marks and citation omitted).  The record is clear that the restriction on Mesa's speech had nothing to do with Mesa's viewpoint on the budget—or, for that matter, his viewpoints on Africa or slavery.  Dublin never objected to Mesa's particular opinions or views; rather, he objected to the discussion of a matter that was not on the agenda—whether it was race, Africa or the budget—and therefore was not appropriately raised at that time.  Dublin sought to "confin[e] the discussion to the purpose of the meeting," even if the restriction on Mesa's speech was not strictly content-neutral.  *Eichenlaub*, 385 F.3d 280–81.

Viewing the record in the most favorable light to Mesa, the Court finds that Mesa has not shown sufficient facts to establish a First Amendment violation and therefore summary judgment must be granted on the First Amendment claim.

### ii. Hudson County Board of Freeholders:

The Court must grant summary judgment as to Mesa's First Amendment claim against the Board because, for the reasons stated above, no First Amendment violation occurred.

### iii. Officers Bartucci and Luzzi:

Mesa's complaint asserts that Bartucci's and Luzzi's conduct violated his Fourth Amendment rights "to be free from excessive use of force."  (Compl. ¶ 25.)

15

The use of excessive force constitutes "an unlawful 'seizure' under the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 395, (1989).  In order to prevail on his excessive force claim, Mesa must show "show that a seizure occurred and that it was unreasonable under the circumstances*." Lamont v. New Jersey*, 637 F.3d 177, 182—83  (3d Cir. 2011) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). The Supreme Court has held that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen must be analyzed under the Fourth Amendment['s] 'reasonableness' standard."  *Graham*, 490 U.S. at 395 (citation omitted).   The question is "whether under the totality of the circumstances the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (internal citations omitted).  This fact-specific inquiry requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 395 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).   As the Court has noted, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," but rather:

> reasonableness . . . must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.
> *Graham*, 490 U.S. at 396–97.

16

The reasonableness determination "traditionally is a question of fact for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) (citing *White v. Peirce County*, 797 F.2d 812, 816 (9th Cir. 1986)).  However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  *Id.* (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Here, the disagreement between Mesa and Dublin at the meeting unfolded quickly and there is no question that: Mesa insisted on speaking after being told it was not the right time; that he repeatedly refused to sit down;  and that he used insulting and combative language, including challenging Dublin and the officers to arrest him.  Given this escalating situation, in which Mesa acted in an unruly manner while Dublin struggled to maintain order, it was "objectively reasonable" for Bartucci and Luzzi to follow Dublin's order to escort Mesa from the room.  Accepting Mesa's claims as true, the officers held his arms as they walked him from the meeting room and once out of the room, Bartucci said, "[h]old him tight" and "press him," while Luzzi held Mesa's arm behind his back for up to two minutes.

Using such tactics to keep a disruptive and truculent Mesa from re-entering the meeting room cannot be said to have been objectively unreasonable under the circumstances.  Mesa was acting in a confrontational fashion, and he admits that the officers neither dragged nor pushed him, and they did not handcuff him.  Mesa also concedes that he did not suffer any bruising or physical injury from the armhold he

described, only that the situation "trigger[ed] a post-traumatic stress syndrome" related to an earlier incident.

Accepting Mesa's facts, the Court finds that the officers' actions, which were designed to control Mesa temporarily while the meeting went on, were objectively reasonable in light of Mesa's conduct and the appropriate requests of the chair that he be removed and kept away. *Graham*, 490 U.S. at 396–97; *Kopec*, 361 F.3d at 776.

The individual officers argue they are protected by qualified immunity, but an analysis of how that doctrine might apply is unnecessary because the Court is satisfied that the officers acted reasonably and therefore no constitutional violation occurred. *Lamont*, 637 F.3d 182—83 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).

### iii. Hudson County Sheriff's Department:

Because Mesa cannot show an underlying violation of his constitutional rights by either officer, he cannot establish a basis for holding the Sheriff's Department's liable. *See Holman v. City of York*, 564 F.3d 225, 23 n.12 (3d. Cir. 2009) (noting that plaintiff's "municipal liability claims would have inevitably failed at the summary judgment stage, since we conclude that no constitutional deprivation occurred."); *see also* Knight v. Carmike Cinemas, 2011 U.S. Dist. LEXIS 93460, at *30-31 (D. Del. Aug. 22, 2011) ("Plaintiff has not alleged an underlying constitutional violation, much less deliberate conduct by the City of Dover or any causal link. Therefore, Plaintiff has not stated a *Monell* claim against the City.").

### iv. Claims against the individual defendants in their official capacities:

Mesa's claims against the individual defendants in their official capacities are dismissed because these claims are "duplicative of plaintiff's claims against the municipality itself" and therefore should be treated as a suit against the entity itself. *Strickland v. Mahoning Tp.*, 647 F. Supp. 2d 422, 428 (M.D. Pa. 2009) (holding that "an official-capacity suit is generally merely another way of pleading an action against an entity of which an officer is an agent.") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

**Conclusion:**

For the reasons stated above, the Court grants defendants' motions for summary judgment (D.E. 59, 60, 61 and 66) as to all claims in Plaintiff's amended complaint (D.E. 15).  An appropriate order will be entered.

September 30, 2011                    /s/ Katharine S. Hayden
                                       Katharine S. Hayden, U.S.D.J.